Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta.
De acuerdo con la Sección 2014 del Código de Rentas Internas de 1994, el Secretario de Hacienda tiene la potestad de imponer y cobrar arbitrios sobre todo vehículo de motor, nuevo o usado, que se importe a Puerto Rico. Según el inciso (c)(1) de la misma sección, el impuesto se computará sobre la base del “precio sugerido de venta al consumidor”, fijado por el importador o distribuidor, antes de arbitrios por la diferencia que surge cuando el precio final de venta del vehículo es mayor que el precio sugerido de venta al consumidor. La mayoría resuelve que esta acción constituye una imposición ilegal de arbitrios y no el cobro válido de contribuciones adeudadas. No puedo suscribir esta conclusión.
HH
Los tribunales tienen la función inherente de interpretar las leyes. Se puede discrepar en cuanto a los límites y métodos adecuados para el ejercicio de la interpretación estatutaria. Y ciertamente se puede fallar en discernir en *303 tre “interpretación” y “creación” de la norma básica aplicable. Ello resultaría en una usurpación de las prerrogativas legislativas y socavaría el propósito de la ley. Pese lo anterior, la literalidad no siempre resulta en una interpretación válida y el cumplimiento cabal con nuestra función interpretativa no puede significar que cada vez que los jueces y las juezas utilicemos métodos de interpretación reconocidos, legislemos desde el estrado. Incluso, el adjudicador siempre tendrá que hacer uso de su función interpretativa para decidir si el lenguaje de un estatuto es claro o si existen dudas, según sus valoraciones profesionales.
Se ha dicho que el legislador construye las instituciones sociales para proteger los intereses y el bienestar del pueblo. Para ello los legisladores seleccionan ciertos objetivos, igualmente rechazando otros, para elaborar normas generales dirigidas a lograr un resultado particular. Estas normas son los instrumentos que los tribunales emplean para llegar al resultado querido. Véase J.C. Cueto-Rúa, Judicial Methods of Interpretation of the Law, Louisiana, Paul M. Herbert Law Center Publications Institute, Louisiana State University, 1981, pág. 177.(1) Aunque la función del adjudicador no sustituye la del legislador, están íntimamente ligadas por la fidelidad del adjudicador a las preocupaciones y los objetivos incorporados en la ley al momento de atender y resolver el caso concreto.(2)
*304 En el ejercicio de nuestra función interpretativa, los jueces y las juezas deben valorar la certeza, estabilidad y predictibilidad del significado de las leyes. En este sentido, la interpretación persigue siempre descubrir la voluntad del legislador. A menudo, resulta suficiente el examen de los textos y documentos del proceso legislativo “y no hay ni adaptabilidad ni creatividad en la interpretación apropiada”. J. Wróblewski, Constitución y teoría general de la interpretación jurídica, Madrid, Ed. Civitas, 1985, pág. 75. No obstante, en ciertas situaciones, la interpretación legal exige adecuar la norma a las necesidades de la vida social, y ello, ciertamente, da paso a un a tarea creativa, mas no a “legislación judicial”. Véase Wróblewski, op. cit., pág. 77. Es esta una “ideología dinámica” de interpretación legal, que no deja de ser un ejercicio válido de adjudicación, ya que con ella no se suplantan los objetivos y las preocupaciones que motivaron al legislador.(3)
Particularmente, la norma respecto al análisis hermenéutico de las leyes tributarias es que éstas deben interpretarse restrictivamente. Véanse: H.C. Black, Handbook on the Construction and Interpretation of the Laws, 2da ed., Minnesota, West Publishing Co., 1911, pág. 515; E.T. Crawford, The Construction of Statutes, St. Louis, Thomas Law Book Company, 1940, pág. 502. Claro está, la interpretación restrictiva de las leyes contributivas debe ser razonable y consonante con la voluntad legislativa para que se preserve su propósito social. Los tratadistas Bernier y *305 Cuevas Segarra coinciden con esta premisa al expresar lo siguiente:
No debe olvidarse que estas reglas de interpretación estricta deben armonizarse con la otra regla que señala que las leyes que imponen contribuciones deben recibir una interpretación razonable tendiente a llevar a efecto el propósito y la intención del legislador. También, que cuando el estatuto es claro y preciso no se aplican las reglas de hermenéutica que son simples ayudas para encontrar la voluntad legislativa. Además, que tampoco se puede interpretar una ley contributiva de manera que facilite la evasión del pago de contribuciones que la Asamblea Legislativa ha intentado imponer. (Citas omitidas y énfasis suplido.) R.E. Bemier y J.A. Cuevas Segarra, Aprobación o interpretación de las leyes en Puerto Rico, 2da ed. rev. y ampliada, San Juan, Pubs. J.T.S., 1987, pág. 466. Véase, además, Crawford, op. cit., pág. 504.(4)
Por estas razones, coincido con la opinión mayoritaria en cuanto expresa que aunque la ley parezca clara, requiere interpretación para buscar y proteger la intención del legislador. Desafortunadamente, la interpretación que efectúa la mayoría en este caso no procura proteger la intención del legislador, que fue la de simplificar el sistema de tributación a beneficio del Departamento de Hacienda y evitar el fraude contributivo.
rH HH
El 17 de octubre de 1992, la Asamblea Legislativa aprobó la Ley Núm. 80, que enmendó la Ley de Arbitrios *306 del Estado Libre Asociado de Puerto Rico de 1987, Ley Núm. 5 de 8 de octubre de 1987 (Ley Núm. 5), 13 L.P.R.A. sec. 7002(a). De esta forma, sustituyó la base contributiva sobre la cual se calculaban anteriormente los arbitrios de los vehículos introducidos a Puerto Rico. A partir de la Ley Núm. 80, supra, el arbitrio a los vehículos nuevos se impone sobre el precio sugerido de venta al consumidor, en vez de utilizarse el sistema anterior basado en peso y caballaje. Al aprobarse el Código de Rentas Internas de 1994, se mantuvieron las enmiendas de la Ley Núm. 80. En este proceso, la definición del precio sugerido de venta de la Ley Núm. 5, según enmendada, permaneció prácticamente inalterada en el Código de Rentas Internas. La misma dispone:
... En el caso de automóviles nuevos y de vehículos de uso múltiple nuevos, introducidos al país por distribuidores y traficantes autorizados, el precio sugerido de venta al consumidor incluirá el costo básico del modelo del automóvil nuevo y del vehículo de uso múltiple nuevo incluyendo el equipo opcional instalado de fábrica, más el seguro y flete de importación, el margen de ganancia para la venta, y los costos asociados con la preparación y entrega del vehículo. (Énfasis suplido.) Art. 79 del Código de Rentas Internas de 1994, según enmendado, 13 L.RR.A. sec. 9001(a)(15)(A) (ed. 2001). Véase See. 1.002(15) de la Ley Núm. 5, supra.
Así, también, se incluyeron en el Código de Rentas Internas las disposiciones de la sección 2.009 de la Ley Núm. 5 (13 L.P.R.A. ant. see. 7059):
... El precio sugerido de venta al consumidor de los automóviles nuevos y usados y de los vehículos de uso múltiple nuevos y usados, será determinado por el importador o distribuidor conforme lo dispone esta parte antes de introducir el vehículo a Puerto Rico. Disponiéndose, que el precio sugerido de venta al consumidor, para cada vehículo, no tiene necesariamente que ser igual para todos los concesionarios pero el arbitrio a pagar se determinará y pagará *307 conforme el precio sugerido de venta al consumidor que aparezca en el rótulo de precios adherido al vehículo y determinado por el distribuidor. (Énfasis suplido.) See. 2014 del Código de Rentas Internas de 1994 (13 L.P.R.A. see. 9014(c)(1)).
Si bien es cierto que estas disposiciones no precisan que el precio sugerido de venta al consumidor necesariamente sea el precio final de venta, la ley y su reglamento hacen lo posible para que ambas concuerden. Del historial legislativo surge que aunque el propósito de la Ley Núm. 80 no fue fijar un impuesto sobre la venta, la Asamblea Legislativa quiso establecer un sistema igualmente objetivo para lograr que la base del cómputo de arbitrios sea el equivalente al precio final de venta. Así, la base contributiva, es decir, el precio sugerido de venta al consumidor, contempla todos los elementos necesarios para configurar un precio de oferta dirigida al consumidor, específicamente, el mar-gen de ganancias y todos los costos que conlleva la importación y la entrega del vehículo. Esto surge del debate legislativo que el Tribunal cita ad verbatim.
La ley, que finalmente se aprobó el 17 de octubre de 1992, surgió de un proyecto que sustituyó el Proyecto de la Cámara 1707. El proyecto original establecía el precio de venta como base para el cálculo de arbitrios, es decir, una especie de impuesto sobre la venta. Particularmente, el inciso (b) del Artículo 2 del proyecto original disponía dos maneras de cobrar el arbitrio. El impuesto se pagaría sobre el precio final de venta a los diez días de la transacción o sobre el precio contributivo estimado a los seis meses de la fecha de introducción del vehículo, lo primero que ocurriera. De aplicarse esta última disposición, el impuesto se ajustaría cuando se vendiera el vehículo. P. de la C. 1707 de 19 de mayo de 1992.
Por otra parte, en cuanto al cómputo de los arbitrios, el proyecto original de la Cámara no adoptó el término que hoy contempla la ley del “precio sugerido de venta al con *308 sumidor”, sino que estableció que los arbitrios se calcularían sobre la base del “costo en Puerto Rico”, el cual
... será el precio f.o.b. [free on board] fábrica cotizado por el fabricante de dichos automóviles a sus distribuidores en Puerto Rico, más un diez por ciento (10%) sobre el precio f.o.b. fábrica por concepto de fletes y de seguros. Art. l(3)(a) del P. de la C. 1707 de 19 de mayo de 1992, pág. 4.
Ciertamente, las citas del debate legislativo transcritas en la Opinión del Tribunal indican que el Departamento de Hacienda recomendó rechazar estos criterios e implantar un sistema más objetivo, lo cual se atendió en el proyecto sustitutivo con la incorporación del término “precio sugerido de venta al consumidor”. En dicha definición se reúnen todos los elementos necesarios para calcular el precio por el cual se debiera vender finalmente el vehículo y sobre ello se computaría el arbitrio. La diferencia entre los dos proyectos estriba en el momento en que se cobraría el arbitrio.
El Departamento de Hacienda recomendó que el evento contributivo, es decir, el momento cuando se cobraría la contribución, fuera cierto, porque de otra forma “afectaría el flujo de fondos” al Estado. Diario de Sesiones de la Cámara de Representantes de 2 octubre 1992, págs. 54-55. Además, cobrar la contribución al momento de la venta o un “precio contributivo estimado” a los seis meses de que el vehículo se introdujera a la isla y ajustar dicho cómputo posteriormente con el precio real de venta, requeriría una contabilidad muy compleja y más difícil de manejar para el Departamento de Hacienda. Id.
El Proyecto Sustitutivo tomó en consideración estas preocupaciones y propuso que la base del cobro de arbitrio fuera el precio sugerido de venta al consumidor: “Así las cosas, hemos preparado este Sustitutivo del Proyecto 1707, que utiliza el precio de venta sugerido. Fíjense que es lo más que se acerca al precio de venta al consumidor.” (Enfasis suplido.) Id.
*309 La restructuración del sistema de imposición y cobro de arbitrios a los vehículos importados a Puerto Rico surge de una preocupación fundamental de evitar un esquema de fraude contributivo. En el debate en la Cámara de Representantes sobre la Ley Núm. 80 de 17 de octubre de 1992 se puso en manifiesto la intención de evitar el fraude y asegurar el mercado libre en beneficio del consumidor. En particular, el Representante José Ronaldo Jarabo, Presidente de la Cámara de Representantes de la Asamblea Legislativa, expuso que en el antiguo sistema de peso y caballaje había un segundo criterio para el cálculo del arbitrio, el factor FOB o “free on board” que catalogó como “desconfiable”. Este se refiere al precio de la mercancía declarado para efectos de la cubierta del medio de transportación, es decir, la cubierta del barco o del tren. Según explica el representante y proponente del proyecto,
... se supone que ese FOB refleje únicamente, y estrictamente, el costo en fabrica [sic] de ese vehículo. En la realidad comercial refleja el producto o resultado de una negociación entre el importador y el fabricante. Es decir, no es un valor que responda al costo real del vehículo, sino por el contrario, es un valor que responde a la transacción a la que llegan en su negociación comercial, en su contratación, el fabricante y el importador. ... [E]n lugar de usar la cifra esa elástica, misteriosa, desconfiable, el FQB[, el proyecto de ley] va a utilizar el cálculo de cuál será el precio de venta al consumidor, que incluye todos los costos, incluyendo las ganancias del importador y el concesionario, si hay un concesionario distinto al importador. Y ese precio será rotulado y puesto en el cristal del vehículo, de manera que el consumidor vea sobre qué cantidad es que está pagando.
Eso permite una certeza que evita las lagunas y los huecos que tiene la actual ley, y que la hacen vulnerable al fraude. (Enfasis suplido.) Diario de Sesiones de la Cámara de Representantes de 2 octubre 1992, págs. 52 y 55.
Conforme la facultad delegada al Secretario de Hacienda de hacer cumplir las leyes bajo su encargo, el 18 de enero de 1994 el Departamento de Hacienda aprobó el Re *310 glamento para la Implantación de la Ley Núm. 80, del 17 de octubre de 1992; Ley para Establecer un Nuevo Sistema de Arbitrios Sobre Automóviles y Otros Vehículos de Motor, Reglamento Núm. 5020 del Departamento de Hacienda (Reglamento 5020). En el mismo se asegura que el precio sugerido de venta sea el precio al que el concesionario venda el vehículo.
El Artículo 3(13) del Reglamento Núm. 5020, a su vez, dispone que la base del precio contributivo será el precio sugerido de venta al consumidor, el cual define de la manera siguiente:
(a) Vehículos Nuevos para la Venta: En el caso de automóviles nuevos [y de vehículos nuevos] y de vehículos de uso múltiple nuevos, introducidos al país por distribuidores y traficantes autorizados, el “precio sugerido de venta al consumidor” significará aquel precio por el cual el vehículo o vehículos similares serán vendidos al detal al público consumidor en el mercado libre, excluyendo el arbitrio, independientemente de si el vehículo en particular va a ser vendido a un precio menor por razón de cualquier consideración comercial o de cualquier otro tipo. Este “precio sugerido de venta al consumidor” nunca podrá ser menor al costo básico del modelo. El precio sugerido de venta al consumidor incluirá el costo básico del modelo y lo siguiente: el equipo opcional instalado en fábrica; el equipo opcional instalado en Puerto Rico; los Seguros y fletes de importación; el margen de ganancia para la venta; los costos asociados con la preparación y entrega del vehículo; y, cualquier otro costo relacionado con la entrega del vehículo. Disponiéndose, sin embargo, que el “precio sugerido de venta al consumidor” no tiene necesariamente que ser igual para todos los concesionarios. ... Toda declaración de venta en exceso del precio sugerido de venta al consumidor deberá ser evidenciada para determinar si el incremento está sujeto al pago de arbitrios adicionales. (Énfasis suplido.) Art. 3(14)(a) del Reglamento Núm. 5020, supra, págs. 6-7.
La Exposición de Motivos de la Ley Núm. 80, supra, indica claramente que el precio final de venta al consumidor se debe fijar por mutuo acuerdo entre el distribuidor/ importador y el concesionario que venderá los vehículos al *311 detal. 1992 Leyes Puerto Rico 389. Así, pues, el artículo 4A(4) del Reglamento Núm. 5020, supra, pág. 12, dispone que:
(4) En el caso de distribuidores que importan automóviles y vehículos de uso múltiple nuevos a Puerto Rico y que mantienen una relación comercial con uno o más “dealers” a los fines de que estos “dealers” realicen las ventas al detal de dichos vehículos, el precio sugerido de venta al consumidor ... será aquel que el “dealer” utilizará para la venta de dichos vehículos al detal.
Esto presupone que el distribuidor deberá determinar el precio sugerido de venta al consumidor para el embarque correspondiente, incluyendo todos los elementos de precio necesarios que hacen posible la presentación de los vehículos al público consumidor y que constituyen el precio de oferta de estos vehículos al detal. (Enfasis nuestro.)
La ley dispone que el arbitrio se determinará y pagará conforme el precio sugerido de venta al consumidor que aparezca en el rótulo de precios adherido al vehículo, el cual, además, debe ser el precio por el cual se ofrece la unidad al consumidor. Véase 13 L.P.R.A. sec. 9014(c)(1). Por ello, y para asegurarse de que sea así, el reglamento establece un procedimiento de enmiendas al rótulo. Véanse: Art. 2011(a)-4(d) del Reglamento Núm. 7437 del Departamento de Hacienda de 14 de diciembre de 2007, pág. 53; Art. 4(4) y (5), y Art. 9 del Reglamento Núm. 5020, supra, págs. 12-14 y 26-29.
Sin embargo, la mayoría del Tribunal entiende que el reglamento que implementa la ley es nulo porque la intervención del Secretario de Hacienda debe limitarse exclusivamente al momento en que se introduce el vehículo al país, y su facultad está limitada a adjudicar la razonabilidad del precio declarado en dicho momento. Lo que la mayoría del Tribunal no alcanza a ver es que la controversia que hoy atendemos no versa sobre la razonabilidad del precio sugerido, sino que se refiere a la facultad del Secretario de Hacienda de ejercer sus funciones, según la intención de *312 la ley, de reducir las instancias de evasión contributiva que se dan a través de los cambios posteriores al precio sugerido de venta. El problema tributario surge cuando el concesionario decide aumentar por su cuenta el precio por el cual se ofrece el vehículo para acrecentar sus ganancias.(5) Con ello burla el sistema establecido y la intención legislativa, según la cual, para efectos tributarios, el concesionario debe acordar su margen de ganancias con el distribuidor, estableciéndose de esta forma el precio sugerido de venta que habrá de declarar. Hacer esto sin cambiar el precio anunciado en la etiqueta adhesiva, en primer lugar, constituye fraude al consumidor, ya que el efecto es ofrecer el vehículo a un precio mayor al que se debe anunciar, según el esquema legislativo. Es también fraude al erario, puesto que el efecto premeditado es evitar pagar la totalidad de los arbitrios debidos.
No obstante, la mayoría entiende que exigir el pago total de los arbitrios debidos es sustituir la base fiscal, razonando sobre la premisa del articulado que dispone que el Secretario de Hacienda podrá sustituir el precio sugerido de venta declarado por el distribuidor cuando entienda que tal cálculo resulte irrazonable. La mayoría entiende que la intención del legislador fue permitir la intervención del Secretario de Hacienda exclusivamente antes de autorizar la introducción de los vehículos y que, por lo tanto, cualquier *313 intervención posterior del Secretario, aunque esté motivado por su deber de hacer cumplir el propósito de la ley, constituye una alteración de la base fiscal.
Las actuaciones del Secretario de Hacienda no constituyen un subterfugio para aplicar un criterio rechazado por la Asamblea Legislativa. No se está cobrando un impuesto adicional sobre la venta del vehículo. Más bien, al pedir los documentos que acrediten el precio por el cual se ofreció el vehículo y el precio por el cual se vendió, el Secretario está fiscalizando, como único puede, que el margen de ganancia que se estimó que percibiría el concesionario por la venta de cada unidad no se haya incrementado ilegalmente, en detrimento de las arcas del Estado y perjudicando al consumidor. La decisión de la mayoría le quita estas herramientas al Secretario para combatir la evasión contributiva.
Es cierto que la intención de la ley, según la Exposición de Motivos de la Ley Núm. 80, fue limitar la intervención de agentes ajenos a la maquinaria del mercado libre, con excepción de la intervención del Secretario de Hacienda antes de introducir los vehículos al mercado. Sin embargo, no es menos cierto que el sistema tributario se estableció de tal manera precisamente para que sean estas "fuerzas naturales de la competencia económica que promuev[a]n que verdaderamente se identifique el precio sugerido como el precio real al que se espera que se venda ese vehículo”. Diario de Sesiones, supra, pág. 55. Claro está, la ley no exige que el precio sugerido de venta sea el precio final de venta, ya que permite que las fuerzas del mercado intervengan en el negocio con el consumidor. Lo que sí exige la ley es que, al menos, el precio final de venta del vehículo no sea mayor que el precio sugerido, puesto que en un sistema de libre mercado un consumidor difícilmente convendrá pagar más que el precio al cual se le ofreció la mercancía. Para eso es que la ley permite un estimado del margen de ganancias, para que el concesionario tenga flexibilidad al *314 negociar con el consumidor el precio final, pero no en detrimento de las arcas del Estado.
Por último, debo mencionar que, en una nota al calce, la mayoría anula las disposiciones reglamentarias que conceden facultad al Secretario de Hacienda para cobrar la deficiencia en los arbitrios al concesionario cuando éste, por su propia decisión, inimputable al distribuidor, no sigue el procedimiento de enmienda al precio sugerido de venta en la etiqueta adhesiva. Aunque esta controversia no está ante nuestra atención —como bien señala la Opinión del Tribunal— el Tribunal igualmente entra a adjudicarla, claramente sin jurisdicción. Además, en el texto de la opinión se reitera esta conclusión al establecerse que el concesionario no debe estar sujeto a los procedimientos de cobro de arbitrios.
III
Para evitar el fraude contributivo y para regir el ejercicio de las facultades fiscalizadoras del Estado,(6) así como aplicar y administrar las leyes contributivas que imponen arbitrios, el Secretario de Hacienda puede “[e]xaminar récords, documentos, bienes, locales, predios, inventarios o cualquier otro material relacionado con artículos, transacciones, negocios, ocupaciones o actividades sujetas a los impuestos y derechos establecidos por la Parte IV”. (Enfasis nuestro.) Sec. 6140(a)(1) del Código de Rentas Internas de 1994 (13 L.P.R.A. sec. 8140(a)(1)). El Reglamento Núm. 5020 establece, además, un procedimiento para aquellos casos en los que el precio que fije el distribuidor o importador, sobre el cual se pagaron los arbitrios, sea menor al precio de oferta al detal exhibido en la etiqueta adherida al *315 vehículo. Véase Art. 4(4) y (5) del Reglamento Núm. 5020, supra, págs. 12-14.(7)
Como la ley exige que el precio de venta se plasme en la etiqueta adhesiva, en cuanto a la emisión de la certificación de pago de arbitrios el reglamento dispone lo siguiente:
(6) Luego de efectuada la venta al detal del automóvil o vehículo de uso múltiple correspondiente, el contribuyente deberá radicar ante el Departamento de Hacienda la Declaración de Ventas que forma parte de la Etiqueta Adhesiva debidamente complementada, o cualquier otro documento que requiera el Secretario y que sea demostrativo de la venta. Esto constituirá un requisito previo a que el Secretario entregue a dicho contribuyente la Certificación de Pago de Arbitrios que permitirá al comprador registrar el vehículo en el Departa *316 mentó de Transportación y Obras Públicas. Art. 9(6) del Reglamento Núm. 5020, supra, pág. 28.
A propósito de la aprobación del Reglamento Núm. 5020, el Departamento de Hacienda emitió un boletín informativo el 30 de junio de 1994 en el cual daba aviso a los traficantes de vehículos de motor de que el sistema mecanizado para vehículos de motor del Negociado de Arbitrios comenzaría a funcionar.(8) Entre los cambios mayores en el funcionamiento del nuevo sistema, se destacaron los siguientes:
7. Al ser realizado el pago del arbitrio de automóviles y vehículos uso múltiple [sic], el Negociado de Arbitrios emitirá una Certificación de Pago de Arbitrios [o] Exoneración Concedida, válida solamente para propósitos financieros.
8. Para poder obtener la Certificación de Pago de Arbitrios [o] Exoneración Concedida, válida para el Departamento de Transportación y Obras Públicas, será requisito que el arbitrio de los automóviles y vehículos de usos múltiples haya sido pagado y sea presentado el Boleto Indicativo de la Venta, debidamente cumplimentado, junto con copia del contrato de compr[av]enta. Esto aplicará en el caso de automóviles y vehículos de usos múltiples nuevos, según lo define la Ley y el Reglamento.
Luego de “evaluar la complejidad y eficiencia de los procedimientos implantados en el Sistema Computarizado para el registro de la declaración de venta y la entrega de la certificación de pago de arbitrios”, el Departamento de Hacienda emitió otro boletín informativo el 6 de diciembre del mismo año para explicar los cambios en los procedimientos de entrega de dicha certificación a todos los traficantes de vehículos de motor. En particular, se anunció que cuando ha habido cambios en la declaración de un precio sugerido de venta, el Departamento de Hacienda requerirá la declaración de venta que forma parte de la etiqueta ad *317 hesiva debidamente completada o cualquier otro documento demostrativo de la venta.(9)
El 30 de octubre de 2002, el Departamento de Hacienda dejó sin efecto el Boletín de 6 de diciembre de 1994, al emitir el Boletín Informativo de Rentas Internas Núm. 02-01 (Boletín). En este boletín se reiteró la obligación de los distribuidores o traficantes autorizados de presentar “la declaración de venta, la Parte B de la etiqueta, debidamente completada o cualquier otro documento que sea demostrativo de la venta” ante el Negociado de Arbitrios Generales. Boletín, pág. 2. Además, se aclaró que:
No se entregará la CPA [certificación de pago de arbitrios] con respecto a vehículos introducidos y vendidos para su registro en el Departamento de Transportación y Obras Públicas a ningún traficante que no haya cumplido con la radicación en el Negociado de Arbitrios Generales de la Parte B de la Etiqueta. No obstante, al efectuarse el pago de los arbitrios de un vehículo que no se haya vendido (inventario) el Secretario entregará al contribuyente un recibo de pago que le permitirá realizar cualquier trámite en el financiamiento comercial. Si al efectuarse la radicación de la Parte B de la Etiqueta surge cualquier diferencia en el pago de arbitrios, el traficante autorizado deberá efectuar el pago total de los arbitrios más los intereses, recargos y multas antes que el Negociado de Arbitrios Generales entregue la CPA para registro del vehículo en el Departamento de Transportación y Obras Públicas. Boletín, pág. 3.
Este sistema reglamentario se mantuvo a través de los varios reglamentos posteriores del Departamento de *318 Hacienda. El Reglamento para Implantar las Disposiciones del Subtítulo B, de la Ley Núm. 120 de 31 de octubre de 1994 derogó el Reglamento Núm. 5020 pero se mantuvo la misma definición de “precio sugerido de venta al consumidor” y el procedimiento para la declaración de arbitrios en casos de automóviles. Véanse: Arts. 2001-1(28) y 2014(a) y (c) del Reglamento Núm. 7215 de 1 de septiembre de 2006. El reglamento vigente conserva el mismo nombre que el anterior, bajo el número 7437. Este reglamento derogó el Reglamento Núm. 7215, pero nuevamente se sostuvo el sistema tributario implantado desde el Reglamento Núm. 5020.(10)
En cuanto al procedimiento de imposición de arbitrios, el nuevo reglamento continúa la práctica de entregar un recibo de pago —al momento de pagar los arbitrios—junto con una certificación de pago de arbitrios, para poder registrar el vehículo a nombre del comprador en el Departamento de Transportación y Obras Públicas. “Esta certificación de pago de arbitrios será entregada por el Secretario al momento de someterse la declaración de ventas que establece el Artículo 2011(c)(3)-5.” Art. 2011(a)-2(d) del Reglamento Núm. 7437, supra, pág. 49.(11)
Esto es cónsono con las medidas para asegurar el cumplimiento con las leyes contributivas. Al respecto, se ha establecido que “[n]o se otorgará a persona alguna una li *319 cencía o tablilla para un vehículo gravado por esta parte, ni el Secretario de Transportación y Obras Públicas emitirá tal licencia o tablilla, a menos que la persona muestre evidencia fehaciente del pago del arbitrio fijado en esta sección o de la exención concedida, si alguna, según sea el caso”. 13 L.P.R.A. sec. 9014(c)(9).
El Secretario de Transportación y Obras Públicas tiene la encomienda de establecer y mantener un registro de to-dos los vehículos de motor importados que transiten o se encuentren en Puerto Rico. El registro deberá contener toda la información sobre la introducción del vehículo, su distribución, venta, traspaso, exportación, desaparición, robo, destrucción, apropiación ilegal, confiscación, abandono, desmantelamiento y alteración sustancial. Art. 4 de la Ley Núm. 8 de 5 de agosto de 1987, según enmendada, 9 L.P.R.A. see. 3203. Para cumplir con sus funciones, la Ley para la Protección de la Propiedad Vehicular le exige al Secretario de Hacienda que le provea al Secretario de Transportación y Obras Públicas cierta información para que proceda con el registro de los vehículos que se introduzcan al país. Entre otros datos, el Secretario de Hacienda debe informar la cantidad pagada en arbitrios, la fecha de pago y el nombre de la persona o entidad que realizó el pago. 9 L.P.R.A. see. 3207.
Además, el Secretario de Transportación y Obras Públicas tiene la facultad de reglamentar "todo lo concerniente a la concesión al registro provisional, y a la documentación que estime necesaria para inscribir finalmente cualquier vehículo de motor ... en el registro ...”. 9 L.P.R.A. see. 5010. Así, pues, la reglamentación del Departamento de Transportación y Obras Públicas dispone que de ninguna forma se podrá inscribir un vehículo en el registro de vehículos, sin contar con el pago de los arbitrios correspondientes. En el Reglamento para Establecer el Procedimiento [de] Registration de Vehículos de Motor y Arrastres cuando Falte *320 algún Documento Requerido de 31 de marzo de 1993, Reglamento Núm. 4900 del Departamento de Transportación y Obras Públicas (Reglamento Núm. 4900), se define el Registro de vehículos de motor y arrastre como “[el] inventario oficial permanente que contiene el universo de vehículos de motor y arrastres autorizados a transitar por las vías públicas de Puerto Rico”, y se enumera la información que contendrá. Arts. Ill y IV del Reglamento Núm. 4900, supra, págs. 2-3. El Artículo V del citado reglamento, pág. 3, dispone:
Toda solicitud de inscripción de un vehículo de motor y arrastre se radicará en el documento que provea el Secretario [de Transportación y Obras Públicas] acompañando la misma de un recibo o documento crediticio] de haberse pagado al Secretario de Hacienda los correspondientes arbitrios de acuerdo con lo preceptuado en la Ley de Rentas Internas de Puerto Rico.
El reglamento dispone lo mismo en cuanto al registro provisional de vehículos. En particular, el Artículo VIII dis-pone:
El Secretario [de Transportación y Obras Públicas] establecerá un registro provisional de los vehículos que estarán autorizados a transitar por las vías públicas por un período que no excederá de treinta (30) días sin el requisito del documento de titularidad. ... Ningún vehículo podrá ser registrado por el Secretario sin haberse pagado los correspondientes arbitrios .... (Énfasis suplido.) Reglamento Núm. 4900, supra, pág. 6.
En el Artículo VIII del Reglamento para Establecer Titularidad, Registros Provisionales, Expedición, Expiración, Renovación, Duplicado, Denegación de Permisos Ordinarios y Especiales, Pago de Derechos Escalonados, Identificación de Vehículo Exento de Inscripción y Control de Números de Arrastres de 29 de diciembre de 2000, Reglamento Núm. 6282 del Departamento de Transportación y Obras Públicas (Reglamento Núm. 6282), también *321 se requiere evidencia de pago de arbitrios o la concesión de una exención para registrar provisionalmente los vehículos que no cuenten con el documento de titularidad necesario para la inscripción definitiva.(12)
IV
El Artículo 6002 del Código de Rentas Internas de 1994 establece un procedimiento formal que impone al Secretario de Hacienda la obligación de notificarle al contribuyente su determinación de deficiencia y proveerle la oportunidad de impugnarla. El contribuyente podrá agotar los remedios administrativos o rechazarlos y proceder a impugnar la deficiencia mediante un juicio de novo en el Tribunal de Primera Instancia, luego de prestar una fianza. El Secretario de Hacienda no podrá comenzar un procedimiento de apremio o acción de cobro hasta la notificación de la determinación final o que la sentencia del tribunal de instancia advenga firme. 13 L.P.R.A. see. 8022.
A su vez, el Código de Rentas Internas también provee un mecanismo para solicitar un crédito o el reintegro de impuestos cuando el contribuyente entienda que ha pagado indebidamente o en exceso de lo debido. Las disposiciones de la Sección 6020 rigen el procedimiento a seguir en los casos del pago en exceso de los arbitrios impuestos. Si se determina que procede el crédito o reintegro a raíz de la solicitud del contribuyente o motu proprio, el Secretario de Hacienda deberá investigar si el contribuyente tiene una deuda contributiva exigible y, de haberla, acreditar su crédito o reintegro. Procedería entonces el reintegro del remanente. 13 L.P.R.A. see. 8035. Por otro lado, si el Secre *322 tario de Hacienda deniega una solicitud de reintegro, aplican las disposiciones de las Secciones 6030 a 6032 del Código de Rentas Internas. 13 L.P.R.A. secs. 8040-8042.(13)
El Código de Rentas Internas de 1994 dispone de estos remedios para cuestionar las actuaciones del Secretario de Hacienda. El remedio extraordinario del injunction no está incluido entre los remedios disponibles al contribuyente para cuestionar o impugnar el pago de arbitrios.
En Barceló, Marques & Co. v. Sancho Bonet, Tes., 55 D.P.R. 284, 288 (1939), resolvimos que:
No importa cuán errónea su interpretación ... pueda haber sido, [al Secretario de Hacienda] no puede impedírsele mediante injunction que cobre la contribución, a menos que el rehusar conceder tal remedio, bajo las circunstancias del presente caso, resulte en una gran injusticia y ocasione daños irreparables a la demandante.
Reiteramos esta norma en Fernández v. Buscaglia, Tes., 60 D.P.R. 596, 598-599 (1942), al resolver que el remedio del injunction se limita a aquellos casos que reflejan claramente que la contribución es ilegal y que: (a) el contribuyente carece de un remedio adecuado en ley, o (b) la contribución le ocasionaría daños irreparables, o (c) ésta daría lugar a una multiplicidad de pleitos. Luego, en Cafeteros de P.R. v. Tesorero, 74 D.P.R. 752, 763-764 (1953), declaramos nuevamente que “no procede un injunction ... en cuanto al pago de contribuciones si el demandante tiene a su alcance un remedio adecuado en ley en cuanto al pago o reintegro de contribuciones”. (Enfasis suplido.) Además, ex-plicamos que:
*323 La regla que hemos enunciado (primero es pagar antes que litigar), está sólidamente basada en una política general inspirada en la protección de intereses sociales de mayor validez y significación que el interés individual transitorio en rehuir el pago inmediato de una contribución. El gobierno no debe ser obstru[i]do en el ejercicio de sus funciones. La doctrina prohibitoria de injunctions al existir un remedio adecuado en ley se basa en el deseo de evitar la paralización de las actividades gubernamentales, en armonía con la protección de los intereses legítimos del contribuyente al concederle a éste una oportunidad razonable de hacer valer sus derechos en el remedio ordinario en ley que está a su alcance. íd., pág. 764.
V
Yiyi Motors solicita que declaremos que las actuaciones del Secretario de Hacienda aquí impugnadas son ilegales porque alteran la base fiscal del cómputo de los arbitrios, requieren sumariamente el pago de contribuciones e impiden el registro de los vehículos. En fin, el peticionario solicita que revoquemos la sentencia del Tribunal de Apelaciones que confirmó el dictamen del foro primario. Contrario a la mayoría de este Tribunal, entiendo que no procede lo solicitado.
Aunque es cierto que la Ley Núm. 80 y el Código de Rentas Internas de 1994 facultan al Secretario de Hacienda para revisar el precio sugerido de venta al momento de la introducción del vehículo a Puerto Rico, el Secretario de Hacienda también tiene la encomienda de velar por el cumplimiento de la ley y sus objetivos. La intención de la Ley Núm. 80, recogida en el Código de Rentas Internas y posteriormente puntualizada en el Reglamento Núm. 5020 del Departamento de Hacienda, es que el precio final de venta sea equivalente al precio sugerido de venta al consumidor no solamente para evitar el fraude contributivo, sino también para asegurar los precios más bajos al consumidor. Ello a través de un procedimiento de rotulación que anuncie el precio de oferta del. vehículo, el cual *324 incluye el costo del vehículo, el flete y los seguros y el mar-gen de ganancias.
No debemos olvidar que la ley prevé que el precio sugerido de venta al consumidor no concuerde necesariamente con el precio final de venta de la unidad, pues ésta es la naturaleza del mercado libre. Sin embargo, se estableció un procedimiento para enmendar el precio sugerido de venta, es decir, el precio por el cual se ofrece el vehículo, que, a su vez, debe estar notificado mediante rotulación en cada vehículo. En fin, la ley y su reglamento establecen un procedimiento que, de cumplirse, obliga al pago total de arbitrios, cual es el propósito del estatuto. Esta disposición sobre enmiendas al precio sugerido de venta al consumidor no debe hacerse inoperante simplemente porque el concesionario o el distribuidor-importador decida incumplir con su obligación de modificar el precio sugerido siguiendo el procedimiento establecido.
Contrario a la interpretación de una mayoría de este Tribunal, un análisis del sistema contributivo impuesto por la Ley Núm. 80 y recogido en el Código de Rentas Internas nos lleva a concluir que el esquema tributario está dirigido a que el precio sugerido de venta sea el precio de oferta de cada unidad. Esto se evidencia en la definición del precio sugerido de venta, la cual reúne todos los elementos necesarios para que un concesionario pueda calcular el precio por el cual ofrecerá cada vehículo. Es sobre esta base que, según la ley, se debe computar el arbitrio; para ello se creó el sistema de rotulación.
Yiyi Motors cuestiona la legalidad del proceso de enmiendas al precio sugerido de venta y de rotulación del reglamento del Departamento de Hacienda porque, alega que el Departamento está imponiendo una contribución adicional. El Tribunal avala estas alegaciones, con el efecto devastador de privar al Secretario de Hacienda del único instrumento que tiene para evitar el fraude contributivo que pueda ocurrir luego de la introducción de los vehículos.
*325 Al pedir evidencia del precio real de venta y la etiqueta adhesiva que anuncia al consumidor el precio sugerido de venta, el Secretario de Hacienda efectivamente puede hacer cumplir el propósito de la ley. Es decir, mediante la presentación de tales documentos, se puede fiscalizar el proceso de declaración de arbitrios. El propósito es confirmar si el precio por el cual se ofrece cada vehículo y, a su vez, el precio por el cual se pagaron arbitrios, fue alterado ilegalmente. La declaración de un precio sugerido inferior al precio real de venta tiene el efecto de evitar el pago completo de la contribución debida. Esto contraviene el procedimiento de enmiendas al precio sugerido de venta al consumidor, el cual salvaguarda la finalidad de la ley de arbitrios, al posibilitar la concordancia entre el precio declarado y el precio final de venta.
Avalar esta práctica también implica descartar una verdadera protección al consumidor, puesto que la rotulación de los vehículos con el precio por el cual los concesionarios están obligados a ofrecer cada unidad pone al consumidor en mejor posición para negociar un mejor precio. Además, permite que el consumidor pueda exigir que no se le venda un vehículo por encima del precio sugerido de venta rotulado en cada unidad.
No hay razón para que un concesionario no pueda cumplir con el requisito de rotulación y con los procesos de enmiendas al precio sugerido de venta. Los factores que componen el precio sugerido de venta al consumidor son datos objetivos fácilmente calculables y a la disposición del distribuidor, lo cual permite declarar el precio sugerido de venta al momento de la importación sin problema. Dichos factores son: el costo básico del modelo, el equipo operacional instalado de fábrica, el seguro y flete de importación, los costos asociados con la preparación y entrega del vehículo, y el margen de ganancia que pretende percibir por cada venta. Salvo un error inadvertido o un ajuste en el margen de ganancias, no sería necesario enmendar los ró *326 tulos que anuncian el precio sugerido de venta al consumidor. El sistema implantado por el Departamento de Hacienda reconoce que el margen de ganancias puede cambiar debido a la realidad de operaciones de un negocio. Por eso se permite corregir el precio sugerido de venta para reflejar lo que se debió haber notificado al momento de introducirse el vehículo. Es menester señalar que ello no implica, de por sí, que el margen de ganancias declarado originalmente fuera irrazonable.
No es sabio, ni nos corresponde, limitar la intervención del Secretario de Hacienda exclusivamente al momento de la introducción de los vehículos. Prohibir que el Secretario de Hacienda verifique las alteraciones a los precios sugeridos de venta en contravención al sistema de rotulación es reconocer abiertamente su impotencia ante un esquema de fraude y evasión contributiva.
De la misma, forma, es evidente que la controversia ante nuestra consideración no tiene que ver con el pago de contribuciones adicionales, sino con la interpretación del Secretario de Hacienda sobre el propósito de la Ley Núm. 80 y las facultades delegadas por ésta. Nuestra función también es interpretativa, según hemos demostrado, y dirigida a hacer cumplir la intención legislativa.
Yiyi Motors alega que requerir sumariamente el pago de arbitrios en este caso violenta las disposiciones del Código de Rentas Internas para la determinación de una deficiencia contributiva. No tiene razón. El Secretario de Hacienda tiene la facultad de velar por el cumplimiento de las leyes contributivas a su encargo y puede interpretar sus disposiciones. Si el contribuyente no está de acuerdo con una determinación del Secretario de Hacienda, tiene a su disposición los procedimientos de impugnación que provee el Código de Rentas Internas. Según explica la opinión disidente del Juez Presidente Señor Hernández Denton, el injunction no es uno de los procedimientos que provee la *327 ley para cuestionar las actuaciones del Secretario de Hacienda en un caso como éste.(14)
La misma parte peticionaria admite y explica que la ley establece los remedios disponibles por la vía administrativa para la impugnación de la contribución que el Departamento de Hacienda le requirió, derrotando en su misma argumentación la procedencia del injunction. (15)
Por todo lo anterior, resolvería que el Secretario de Hacienda actuó en el ejercicio de su facultad de hacer cumplir las leyes tributarias. En cuanto al Secretario de Transportación y Obras Públicas, resolvería que actuó correctamente al no inscribir un vehículo que no cuenta con la certificación del pago de arbitrios que emite el Secretario de Hacienda, pues las leyes del Departamento de Transportación y Obras Públicas, anteriormente discutidas, categóricamente se lo prohíben.
No siendo éste el criterio mayoritario, me veo compelida a disentir.

 Véase, además, M. Radin, A Short Way With Statutes, 56 Harv. L. Rev. 388, 407 (1942):
“A statute is better described as an instruction to administrators and courts to accomplish a definite result, usually the securing or maintaining of recognized social, political, or economic values. If figures of speech help, we may call the statute a ground design, or a plan in which details are given only so far as they are necessary to assure the erection of the desired structure.”

 “A judge who views legislative enactments as instrumental or remedial tools, which is the predominant perspective from which the legislator himself looks at his activities, and the judge who remains loyal to the concerns and objectives of the legislator cannot, then, undertake the interpretation and application of the rule of law as though the rule were a mere logical entity beyond the practical needs of the people or as though it were a purely historical object having roots in a past that exists no more. Instead, the mission of a judge may be seen as being essentially *304 linked to that of the legislator, committed to the achievement of the same legislative purpose in each of the concrete and individual cases brought before him.” J.C. Cueto-Rúa, Judicial Methods of Interpretation of the Law, Louisiana, Paul M. Herbert Law Center Publications Institute, Louisiana State University, 1981, págs. 177-178.

 Pero, además, es un ejercicio muy necesario, porque de otra forma “el derecho resultaría en un gobierno de los muertos sobre los vivos. El significado de las reglas cambia en la medida en que cambian los contextos en los que opera”. J. Wróblewski, Constitución y teoría general de la interpretación jurídica, Madrid, Ed. Civitas, 1985, pág. 76.

 Sobre este precepto nos hemos expresado en Licorería Trigo, Inc. v. Srio. de Hacienda, 94 D.P.R. 270, 279 (1967), y hemos dado el visto bueno a la interpretación restrictiva de las leyes contributivas, pero no a espaldas de la voluntad del legislador. Véase United States v. One Hundred Barrels of Spirits, 2 Abb. 305, Fed. Cas. No. 15,948, que explica el deber de los tribunales de buscar la verdadera intención del legislador al interpretar las leyes contributivas:
“But it is the duty of the court to study the whole statute, its policy, its spirit, its purpose, its language, and, giving to the words their obvious and natural import, to read the act with these aids in such a way as will best effectuate the intention of the legislature. Legislative intention is the guide to true interpretation.”

 En la discusión en el Senado sobre el Informe de Conferencia del Sustitutivo al P. de la C. 1701 de 8 de octubre de 1992, pág. 36, el señor Nogueras, hijo, explicó las razones por las cuales se abstuvo de votar. Particularmente, con relación a la incertidumbre del costo de los vehículos y del margen de ganancias que generalmente perciben los concesionarios por la venta, expresó lo siguiente:
‘Yo creo que el esfuerzo es válido, yo creo que las medidas que mejoran los enfoques en este tipo de asunto son útiles, sin embargo, me parece que aquí hay un campo casi misterioso que siempre surge cuando se brega con la venta de automóviles. Yo me recuerdo, salvo que hubiera ocurrido lo contrario en las últimas semanas, que no hubo un solo distribuidor o vendedor de automóviles que le sometiera la Comisión de Hacienda dato alguno sobre el verdadero costo de ese automóvil puesto en Puerto Rico. Y sobre el margen de beneficio que tenía la venta que se hacía a los consumidores. Y me recuerdo que se le requirió muchas veces en la Comisión de Hacienda y que nunca tuvimos a nuestro alcance esa información.”

 El Artículo 9 de la Ley Núm. 80 de 17 de octubre de 1992 (1992 Leyes de Puerto Rico 403), encomienda al Departamento de Hacienda y al Departamento de Asuntos del Consumidor fiscalizar el cumplimiento de esta ley.

 El Artículo 4(4) y (5) del Reglamento Núm. 5020, supra, págs. 12-14, establece, en lo pertinente, lo siguiente:
“(4) En el caso de que el distribuidor incluya en la Declaración de Arbitrios un precio sugerido de venta al consumidor menor al precio de oferta al detal que el ‘dealer’ exhibirá para el vehículo particular, será responsabilidad del distribuidor radicar ante el Director una Declaración de Arbitrios enmendada que refleje la diferencia en el precio sugerido de venta al consumidor y el arbitrio a pagar. En este caso, el Negociado de Arbitrios permitirá al distribuidor una nueva etiqueta adhesiva, según se establece en el Artículo 9 de este Reglamento, que reflejará el nuevo precio sugerido de venta al consumidor y que sustituirá la etiqueta que originalmente se le entregó a dicho distribuidor para el vehículo en particular.
“(5) No obstante lo anteriormente dispuesto, cuando sea el ‘dealer’ el que gestione un aumento al ‘precio sugerido de venta al consumidor’ por razón de fluctuaciones de mercado o por cualquier otra causa particular, el ‘dealer’ deberá notificar inmediatamente al distribuidor su deseo de solicitar el aumento y la emisión de una nueva etiqueta adhesiva, acompañando con la solicitud el importe correspondiente a la diferencia en el pago de arbitrios. Una vez recibida por el distribuidor la correspondiente solicitud del ‘dealer’, el distribuidor deberá entonces radicar la misma al Director y se emitirá una nueva etiqueta.
“En aquellos casos en que el ‘dealer’ no informe al distribuidor su intención de aumentar el ‘precio sugerido de venta al consumidor’ y no acompañe el pago de arbitrios por la diferencia, será responsabilidad de dicho ‘dealer’ el pago de los arbitrios por la diferencia, más los intereses, penalidades, multas y recargos correspondientes. No obstante, en aquellos casos donde el ‘dealer’ notifique por escrito al distribuidor el ‘precio sugerido de venta al consumidor’ para un vehículo en particular, el distribuidor deberá declarar dicho vehículo con el ‘precio sugerido de venta al consumidor’ notificado por dicho ‘dealer’.” Art. 4(4) y (5) del Reglamento para la Implantación de la Ley Núm. 80, del 17 de octubre de 1992; Ley para Establecer un Nuevo Sistema de Arbitrios Sobre Automóviles y Otros Vehículos de Motor, Reglamento Núm. 5020 del Departamento de Hacienda, págs. 12-14.

 El Código de Rentas Internas dispone que los boletines informativos y las cartas circulares “constituyen la interpretación oficial de la ley que el Secretario de Hacienda está encargado de interpretar”. 13 L.RR.A. see. 8130.

 En el Boletín Informativo de 6 de diciembre de 1994, el Departamento de Hacienda hace una distinción entre los traficantes afianzados y los no afianzados. En cuanto a los traficantes afianzados, la entrega de la certificación de pago de arbitrios se hará luego del pago total de los arbitrios declarados que permita al traficante, al banco o al comprador registrar el vehículo en el Departamento de Transportación y Obras Públicas. Para los traficantes no afianzados, “se mantendrá el procedimiento establecido en el Boletín Informativo del 30 de junio de 1994, emitido conforme al Reglamento para la Implantación de la Ley Núm. 80 del 17 de octubre de 1992”. Por último, para ambos tipos de traficantes de vehículos, el Departamento de Hacienda requirió la declaración de venta que forma parte de la etiqueta adhesiva y el contrato de compraventa para la emisión de la certificación de pago de arbitrios.

 El Reglamento Núm. 7437 del Departamento de Hacienda de 14 de diciembre de 2007, pág. 143, dispone que en él se recoge el estado de derecho vigente, por lo que no hay problema con su aplicación retroactiva. No obstante, el reglamento también dispone que aquellas disposiciones que representen un cambio en el estado de derecho no tendrán efecto retroactivo a menos que surja la intención expresamente.

 El artículo al que se hace referencia exige que, luego de efectuarse la venta del automóvil, el concesionario, el importador o el distribuidor entregue al Departamento de Hacienda el Boleto de Verificación de Venta de Vehículo de Motor, Parte B de la etiqueta, debidamente completada o cualquier otro documento que requiera el Secretario y que demuestre la venta. Art. 2011(c)(3)-5 del Reglamento Núm. 7437, supra, págs. 66-67. “Esto constituirá un requisito previo a que el Secretario entregue a dicho vendedor de vehículos de motor al detal (o concesionario), importador o distribuidor la Certificación de Pago de Arbitrios que permitirá registrar el automóvil en el Departamento de Transportación y Obras Públicas.” Id., pág. 67.

 El Artículo XVII del Reglamento Núm. 6282 dispone que toda reglamentación o procedimiento administrativo que esté en vigor y que sea incompatible, en todo o en parte, con este reglamento quedará derogado. íd., págs. 15-16. Las disposiciones citadas del Reglamento Núm. 4900 son completamente armonizables con lo dispuesto en el Reglamento Núm. 6282.

 En Cervecería India v. Srio. de Hacienda, 80 D.P.R. 271, 275-276 (1958), resolvimos que bajo la antigua Ley de Rentas Internas, “el único procedimiento que existe para litigar arbitrios es mediante la revisión de una determinación del Secretario de Hacienda negándose a conceder una solicitud de reintegro ...”. Es decir, para cuestionar el cobro de arbitrios o reclamar la exención de su pago, el único recurso era pagar el arbitrio y solicitar un reintegro. Véase G. Meléndez Carrucini, Procedimiento contributivo de Puerto Rico (apelaciones administrativas y judiciales), Instituto de Contribuciones de Puerto Rico, Inc., 1981, págs. 957 y 969.

 No surge del expediente que el Secretario de Hacienda haya emitido una determinación de deficiencia, ni que la parte peticionaria haya solicitado reconsideración ante el Departamento de Hacienda. Tampoco surge del expediente que se hayan pagado los arbitrios que exigió el Departamento de Hacienda para que proceda una solicitud de reintegro. Además, el peticionario tiene otros remedios disponibles y el daño económico que alega sufrir la parte peticionaria no es un daño irreparable que amerite acudir a este remedio extraordinario. No podemos permitir el uso del recurso de injunction para evadir el procedimiento normal de revisión.

 En su petición de certiorari, Yiyi Motors alegó que “las contribuciones adicionales impuestas por el Secretario de Hacienda constituyen una ‘deficiencia’ contributiva” y sostuvo su alegación con referencias a la sección 2014(c)(2) del Código de Rentas Internas, la cual dispone que la determinación del Secretario de Hacienda no menoscabará las disposiciones sobre el cobro de deficiencias. Petición de certiorari, págs. 29 y 35.